RUMSEY, WILLIAMS and INGRAHAM, JJ., concurred; VAN BRUNT, P. J., concurred in result.

Decree reversed in part, and modified as directed in opinion, with costs of appeal and costs in the Surrogate's Court to the appellants to be paid out of the fund.

---

PETER B. OLNEY, as Receiver of THE SARGENT GRANITE COMPANY, Respondent, *v.* MATTHEW BAIRD and WILLIAM P. BAIRD, Appellants.

*Corporations — when insolvent — what transfers are made in contemplation of insolvency — suffering a judgment to be taken in a foreign State, designed to create a preference.*

In an action brought by the receiver of the Sargent Granite Company to set aside certain transfers of personal property made by it to the defendant Matthew Baird, it appeared that all but five of the 200 shares of the capital stock of the corporation had been issued for property which was transferred to

the corporation; that one C. F. Schramme, who held about 100 shares, or one-half of its capital stock, had loaned $10,000 to the corporation, which had given him therefor a bill of sale of all its property, intended in fact to operate as a chattel mortgage; under these circumstances Schramme entered into negotiations with Matthew Baird, which resulted in an arrangement by which Baird agreed to take the place of Schramme, and to take an assignment of his stock and of the indebtedness to him of the corporation which was not at this time insolvent. Frank D. Sargent, who was the president of the corporation, agreed to this arrangement, Matthew Baird agreeing to make advances to the corporation provided that all of the products of the company should be consigned to him, and that the proceeds of their sale should be collected by him.

As soon as Baird had become a stockholder in the corporation he was elected a trustee and also secretary and treasurer; he received and kept all its moneys in a bank account in his own name. He was a contractor having large use for granite. During a period of twenty months Baird made advances to the company which brought it in his debt to more than $100,000, but no bills of sale were given to him as security for these advances. Some twenty months after Baird became a stockholder he became alarmed as to the financial condition of the company, and requested its president, Frank T. Sargent, to execute to him a bill of sale of its property to be held by him as security for his claim, and this was done; just before the execution of this bill of sale Matthew Baird resigned as secretary and treasurer and trustee of the corporation, and about two weeks later he transferred all his stock in the corporation, without any consideration, to certain persons occupying confidential relations towards him, the transferees understanding that they had no absolute interest in the stock, but were simply acting in the interest of Baird, he agreeing that they might have whatever was left of it after Baird had been paid his claims against the company. About a month later the trustees by a resolution transferred to Baird their lease of a granite quarry, and still later authorized the president to execute a bill of sale covering all stone manufactured and unmanufactured and not already covered by the previous bill of sale. The stockholders also confirmed the first bill of sale. Subsequently Baird obtained possession of the granite quarry which had been leased to the corporation, the old lease being surrendered by the corporation and a new one made by the lessors to Baird.

Thereafter he began an action in the State of Maine against the corporation to recover his advances. An attachment was issued, service of process being made in the State of Maine on an officer of the corporation, who had gone to that State at the instance of Baird for the purpose of being served. Judgment was recovered in the action; the property was sold, subject to some attachment liens, amounting to $20,000, to Baird's son, but in his interest, for $2,000, which appeared to be a very inadequate price. During the period of all these transfers the company was insolvent, and known to be so by its officers.

The corporation was in debt for rent, merchandise and wages, and was generally unable to pay its obligations when they became due in the regular course of business.

*Held,* that the corporation was insolvent within the meaning of the Stock Corporation Law (§ 48, chap. 564 of 1890), providing that "no officer, director or stockholder thereof shall make any transfer or assignment of its property, or of any stock therein, to any person in contemplation of its insolvency; and every such transfer or assignment to such officer, director or other person, or in trust for them or for their benefit, shall be void;"

That the transfers to Baird were void under that law;

That the judgment suffered by the corporation, in the action brought against it by Baird, was void as a preference under the Stock Corporation Law, as amended by chapter 688 of the Laws of 1892.

APPEAL by the defendants, Matthew Baird and another, from an interlocutory judgment of the Supreme Court in favor of the plaintiff, entered in the office of the clerk of the county of New York on the 15th day of January, 1896, upon the decision of the court rendered after a trial at the New York Special Term.

*Joseph Fettretch,* for the appellants.

*George Carlton Comstock* and *Samuel A. Noyes,* for the respondent.

VAN BRUNT, P. J. :

This action was brought by the plaintiff, as receiver of the Sargent Granite Company, to vacate and set aside certain transfers of personal property made by the Sargent Granite Company to the defendant Matthew Baird during the year 1892, upon the ground that said company was insolvent at the time of making such transfers, and that the same were made in contemplation of insolvency; and also to set aside a certain lease made to him of property which had previously been leased to the Sargent Granite Company, and to have declared fraudulent and void a judgment obtained by the defendant Matthew Baird, in the State of Maine, against the said company, and the execution and sale thereunder.

We might very well dispose of this appeal upon the very satisfactory opinion rendered by the learned judge at Special Term,*

---

* The following is the opinion referred to :

BEEKMAN, J. :

The Sargent Granite Company, a business corporation duly organized and incorporated under the laws of the State of New York, having become insolvent, an action was instituted against it on behalf of certain of its judgment creditors for a sequestration of its property, and in that suit the plaintiff has been appointed

were it not for the circumstance that the learned counsel for the appellant insists so strenuously that the evidence contained in this record was misconceived by the court below, and that a mistaken view as to its probative force was the reason why the court reached the conclusion which it did. It seems to us, however, that a very brief statement of the facts as they appear upon the record will show that no other conclusion could have been arrived at, and that the transfers in question were made to the defendant Matthew Baird, when he knew that the company was insolvent, and that it was in contemplation of the stoppage of its business that they were made, and that during all the time he was in reality a stockholder of the corporation, although he had nominally transferred his stock for the

receiver. No assets have come into his hands, and he now brings this action against the defendants for the purpose of recovering the property of the corporation, of which the defendant Matthew Baird claims ownership, under the following state of facts :

On or about April 7, 1890, the Sargent Granite Company was organized as a corporation under the General Manufacturing Act (Laws of 1848, chap. 40) of the State of New York. Its capital was fixed at $20,000, represented by 200 shares, of which all but five were issued for property which was transferred to it. In order to obtain money with which to carry on its operations the company borrowed from one C. F. Schramme the sum of $10,000, and for the purpose of securing him gave him a bill of sale of all of its property, which bill of sale, although absolute in form, was intended by the parties to operate only as a chattel mortgage. Mr. Schramme also held about 100 shares, or one-half of the capital stock of the company. Being desirous of severing his relations with the company, he entered into negotiations with the defendant Matthew Baird, and it was finally agreed between them that Baird should take a transfer and assignment from Schramme of his stock and the indebtedness of the corporation to him, upon payment of the amount of said indebtedness, which was then about $9,900. The understanding was that Mr. Baird should take the position of Mr. Schramme in the company, with all the rights as against it which the latter then enjoyed. This transaction was consummated about the 27th day of August, 1890, and the stock in question was transferred to Baird, and the bill of sale was also delivered to him at the same time. No formal assignment of the latter was ever executed, and whatever view may be taken in respect to its validity in law as a chattel mortgage, it was sufficient in the hands of Mr. Schramme, and, under the arrangement between himself and Mr. Baird, also in the hands of the latter, to constitute at least a preferential equitable charge upon the assets of the corporation in favor of the holder. At that time the corporation was not insolvent, nor had it refused to pay its notes or other obligations when due. The determination of the effect of this bill of sale, however, is not within the issues of this action. The transaction was the outcome of an understanding which had

purpose of freeing himself from the disabilities attending that position.

It appears that the Sargent Granite Company was a corporation organized as a mining corporation under the laws of the State of New York on the 7th of April, 1890. The capital of the corporation was fixed at $20,000, represented by 200 shares, all of which, except five, were issued for property which was transferred to it. Prior to the 28th of May, 1890, Mr. Schramme, who was one of the stockholders and directors of the company, had advanced considerable sums of money and upon that day the company gave to Schramme a bill of sale of all its property consisting of stock in trade, tools and machinery as security. In the latter part of

been arrived at between Mr. Baird and Frank T. Sargent, who was then the president of the corporation. The understanding was that Mr. Baird should acquire Mr. Schramme's interest as above stated; that he would also from time to time advance such money as might be needed for the operations of the company; that all of the products of the company should be consigned to him; that the proceeds of the sale of such products should be collected by him, and that interest on balances should be credited or allowed, as the case might be, at the rate of six per cent per annum. It is claimed by Mr. Baird that, in addition to this, it was also understood and agreed that the company, for the purpose of securing his advances, would, from time to time, give him bills of sale of everything it had, and assignments of all moneys due it upon contracts. This, however, is denied by Mr. Sargent. I feel constrained to accept Mr. Sargent's version of the matter; among other reasons, because it seems more in accord with the probabilities of the case, as well as with the subsequent conduct of the parties. Although Mr. Baird, during a period of some twenty months after he came into the company, had made advances which brought the company into his debt to the extent of something over $100,000, no bills of sale were ever made to him, nor, apparently, did he request that they should be given, and, subsequently, when such transfers were made, in some cases, under resolutions passed by the trustees reciting the reasons for their action in that regard, no reference of any kind was made to any previous understanding or agreement, such as the defendant Baird claims to have existed. It is not necessary for me, therefore, to consider whether such an arrangement, which, it is conceded, never received any formal sanction by vote of the trustees, would have been valid.

Immediately upon Mr. Baird's becoming a stockholder of the corporation, he was elected a trustee and also secretary and treasurer. No bank account, however, was opened in the name of the company, but all of its moneys, from whatever source, were received by him and deposited in his individual account. A ledger account was kept by him with the company, in which he charged it with the moneys which were advanced by him, and which were, from time to time, paid out to meet the current expenses of the corporation, and credited it with the

August, 1890, Schramme, his advances being about $10,000, became dissatisfied and asked Mr. Frank T. Sargent, the president of the company, to get some one to buy him out and take his place. Sargent thereupon called upon Mr. Matthew Baird and told him that Schramme was willing to transfer his bill of sale and give all the stock he had in the company — which at this time amounted to 100 shares — to Baird, if he would take Schramme's place. Sargent and Baird had some further conversation in regard to Baird's furnishing money to the company for the purpose of enabling it to carry on its business, and it was agreed that the company should ship all its products to Baird and that he should collect the accounts and apply the proceeds to the payment of any money that he had advanced to the

moneys collected by him on its account. It may be said in passing that Baird had peculiar facilities for handling the product of the company, in view of the fact that he was a contractor doing a very extensive business in this city with the different departments of the city government, which required the use of granite, either for the paving of streets or the construction of piers and bulkheads on the water front.

In the month of March or April, 1892, he seems to have become alarmed about the financial condition of the company, and requested Mr. Frank T. Sargent, who was still its president, to execute to him a bill of sale of its property, to be held by him as security for his debt. Mr. Sargent testifies that, at first, he refused to do so, claiming that it would be unfair to the other creditors; but that, upon a threat being made by Mr. Baird to wind the company up, he yielded, and the paper was accordingly executed and delivered, the secretary of the corporation who succeeded Mr. Baird joining in its execution, and on or about the 9th day of May, 1892, was recorded in the clerk's office, in the city of Belfast, in the State of Maine. Mr. Baird denies that he made any such threat. Some three days prior to the date of this bill of sale a special meeting of the trustees of the company was held, at which the resignation of Mr. Baird, as secretary and treasurer and as trustee, was received and accepted, but no other action of any kind was taken, nor was any authority whatsoever given to the president to make the bill of sale in question. The resignation of Mr. Baird was, obviously, prompted by prudential motives, in view of the fact that his security under the bill of sale would have been very much impaired, if not entirely destroyed, by the fact of his being an officer of the company at the time of its execution and delivery.

On the eighteenth day of May following, and for the same reason, he took the further step of divesting himself of all his stock in the company, which he transferred to one George L. Harrington. During all the time that Mr. Baird was connected with the company either as stockholder or creditor, Mr. Harrington was his superintendent in his personal business, and when the stock was so transferred to him, he was told by Baird that he could have whatever there was of it after the indebtedness of the company to him (Baird) had been paid, and at the

company. Mr. Baird testified that it was further a part of the agreement that he was to receive from time to time from the company security in the form of bills of sale for the moneys which he might advance. This portion of the agreement is denied by Sargent. The court below, upon considering all the evidence, came to the conclusion that although Sargent's testimony was not to be accepted in all other respects, he had given the true version of the arrangement between Baird and himself upon the occasion mentioned.

It is urged upon the part of the appellants, however, that the learned court was mistaken and that Baird's version of the transaction was confirmed by the witness Schramme and by the probabilities of the case. It is contended that because Schramme testified,

---

same time Baird directed him out of the shares so transferred to give ten shares to one William J. Clark, twenty shares to one William H. Keyes and ten shares to one Babcock. Clark was Baird's confidential clerk and bookkeeper, and Keyes was a superintendent in the employ of James Baird, who was a brother of the defendant Matthew Baird. According to Mr. Baird's statement, the understanding between them was that they were to become absolute owners of the stock in question, and were entitled to get out of it whatever might be coming to the stockholders. No consideration of any kind passed upon the transfer, nor is it claimed that it was anything more than an absolute gift of the stock in question to these persons. I shall have occasion hereafter to refer to this transaction as somewhat persuasive evidence of a conviction on the part of Baird that the company was hopelessly embarrassed at the time.

On the day following this transfer, Mr. Harrington was elected a trustee to fill the vacancy created by Baird's resignation. At the same meeting a resolution was adopted that all moneys due or to become due to the company from Mr. G. H. Mitchell, of Chicago, be assigned to the defendant Matthew Baird, and also that all moneys due or to become due to the company from one Gallagher should also be assigned to him.

On the twenty-fourth day of June, at a meeting of the trustees, a motion was made by Mr. Harrington, which was unanimously carried, "to transfer the lease of the Mount Haegan granite quarry to Matthew Baird as collateral security for money due him by the Sargent Granite Company, said lease to be transferred back to the company on their paying off such indebtedness."

Again, on the twenty-eighth day of July a further meeting of the trustees of the company was held, at which a motion was made by Mr. Harrington, which was carried, apparently without opposition, "that the president be authorized to give a bill of sale covering all stone manufactured and unmanufactured, and any personal property, not already covered by the previous bill of sale, to Matthew Baird, as security for money advanced to the company."

No other meeting seems to have been held until the 29th day of August, 1892. In the meantime, and on the 25th day of August, 1892, a meeting of the stockhold-

"thereupon Mr. Sargent came to me and told me that he had made an arrangement with Mr. Baird to take my place," he corroborates Baird in regard to the transaction. We are unable to agree with the learned counsel for the appellants upon this proposition. There is nothing in the testimony of Schramme, so far as we have been able to ascertain by a reading thereof and a careful examination of the points of the appellants, to indicate that there was any arrangement by which Schramme was to receive from the company from time to time security in the form of bills of sale for the moneys which he might advance.

It is claimed upon the part of the appellants that the evidence may be so construed as to establish that Schramme received his bill of

ers of the company was held, at which the following trustees were elected: Francis T. Sargent, W. Otis Sargent, William J. Clark, William H. Keyes and George L. Harrington; and on the twenty-ninth day of August the trustees thus chosen met and elected George L. Harrington president of the company, William H. Keyes vice-president, and William J. Clark secretary and treasurer. At the same time a resolution was passed, which, after reciting that the Sargent Granite Company was indebted to Matthew Baird in a sum exceeding $50,000 for moneys paid by him to the company and for its account and benefit, and that the company, for the better securing of such indebtedness, had, through its president and secretary, made and delivered to Baird the bill of sale above referred to, bearing date on the 19th day of April, 1892, ratified and confirmed the action of said officers, and declared that such paper should have the same effect as if said officers had been authorized by the board of trustees to execute and deliver the same. A further resolution was also passed, which, after reciting that since the 19th day of April, 1892, Baird had paid out large sums of money on account of the company, for which the company was still indebted to him, provided that, for the better securing of the entire indebtedness, the company should make, execute and deliver to him "full and complete bills of sales of all its personal property, goods and merchandise wherever situated, including that described in the bill of sale aforesaid of April 19th, 1892, as well as such as has come into its ownership since that date," and the president of the company was directed to execute and deliver the same to him.

On the 23d day of September, 1892, the trustees again met, and a resolution was passed which recited that the company had entered into a contract with one Patrick Gallagher, and that in the performance of said contract by the company Matthew Baird had advanced and loaned moneys to said company, and also that the company was indebted to Baird in large sums of money; and it was thereupon resolved that all moneys then due, or thereafter to become due, to the company, under said contract, should be assigned and transferred to Baird as payment, on account of the indebtedness of the company to him, and the president of the company was authorized and directed to execute and deliver such an assignment.

sale before he made the advances which were repaid by Baird at the time of the substitution of the latter for him. And this construction undoubtedly may be put upon the evidence; but it in no way corroborates the appellants' claim that there was any continuing agreement that bills of sale were to be executed from time to time for moneys which might be advanced by Schramme; and there is no proof that any agreement of the description claimed by the appellants ever existed in favor of Schramme. At the time of the negotiation with Baird the company was indebted to Schramme in something less than $10,000, the amount of the bill of sale. If we concede that the agreement between Baird and Sargent was of the character testified to by Baird, it is difficult to see how such an

At the same meeting another preamble and resolution was also adopted, under which the lease of the company, made on the 6th day of June, 1891, of certain real estate, which will be referred to hereafter as the Mount Haegan quarry, was surrendered and canceled. This resolution recites that it was deemed for the best interests of the company that such action should be taken, and the treasurer of the company, Mr. Clark, was authorized and empowered to cause the necessary instrument of cancellation to be made, executed and delivered to the lessors. A further resolution was also adopted which recited a contract between the company and one G. H. Mitchell, for furnishing him with certain granite; that in the performance of said contract by said company, Matthew Baird had advanced and loaned, and was about to advance and loan, moneys to said company; and it was thereupon resolved that all moneys due, or to become due, under said contract, should be assigned and transferred to said Baird on account and in part payment of what was then due from said company, to him, and the usual direction was given to the officers of the company to carry the resolution into effect.

The next and the last meeting of the board of trustees, of which any record is found in the minute book, was held on the 9th day of November, 1892, and the following business was transacted at that meeting: The resignation of Francis T. Sargent as trustee was presented and accepted, and one George E. Babcock was elected to fill his place. A resolution was passed, under which, after reciting that numerous actions had been brought against the company, both in this State and in the State of Maine, it was resolved that Messrs. Harriman and Fessenden be retained to act for and on behalf of the company in all of said actions, with full power to act in such manner as they might deem for the interests of the company. Two other resolutions were passed, one forbidding Francis T. Sargent and the other forbidding Winthrop O. Sargent from interfering or intermeddling with the business or affairs of the company.

All of the transfers seem to have been executed in conformity with these various resolutions, except that instead of the lease of the Mount Haegan quarry being assigned as authorized at the meeting of June 24, 1892, it was surrendered under the resolution of September 23, 1892. The motive of the company in sur-

agreement could be binding upon the company. Mr. Sargent, the president, had no authority by virtue of his office to make an agreement by which at any moment the company could be stripped of all its property and prevented from conducting the business for which it was organized. And even if such an agreement could have been made by the trustees of the corporation, there is no evidence that Mr. Sargent was authorized to make any such contract.

But it may be said that the corporation by its duly constituted officers subsequently executed bills of sale of the character claimed by Mr. Baird; and that this was a ratification of the authority of the president to make such an arrangement, if it had been made. We fail to see that any such effect can be given to the action of the

rendering this lease becomes apparent when we consider the action taken by Mr. Baird in the matter. On or about the 27th day of September, 1892, some four days after the meeting of the trustees at which the resolution was passed authorizing the surrender and cancellation of the lease, Mr. Baird went to Bangor and had an interview with Captain Goodwin, who was one of the lessors. Frank T. Sargent was present at the time, and at that interview Mr. Baird requested Captain Goodwin to accept the surrender of the lease, and to make out a new lease of the property, upon substantially the same terms, to him individually. There was some objection made to this, on the ground that Mr. Frank T. Sargent held an option for the purchase of the fee of the property, but this difficulty was disposed of by a cancellation of the option, and the surrender of the lease was accepted and a new lease made to Baird in conformity with his request, the latter at the same time paying to Captain Goodwin the rent under the old lease, which was very much in arrears, and also an additional sum representing another indebtedness of the company to Goodwin. At the same time, and apparently as an inducement to Mr. Sargent to withdraw his opposition to the transaction, a letter was then and there written to him by Mr. Baird, which is dated September 27, 1892, and which contains the following statement: "Being about to take possession of the quarry at Mount Haegan, Maine, and having expended considerable moneys for tools, derricks, horses, cattle, machinery, boilers, railroads and &c., &c., I will agree with you if you want to work with me in the same, under my direction, from this date to January 1, 1894, and if the quarry will by that date be able to earn money enough to pay up to me all the moneys, with interest and expenses expended by me before this date, and up to the date of January 1, 1894, I will then agree to transfer to you one-third interest I have in the above quarry, tools, machinery," etc. Mr. Sargent's explanation of this is that he intended to make this arrangement for the benefit of the stockholders. Whether this explanation be true or not, it is not relevant to the decision of the case. Its value is found chiefly in its bearing upon the intent of the defendant Matthew Baird in securing the lease in question in his own name.

Down to this point it will be apparent from the facts which I have stated that, commencing with the 19th day of April, 1892, and ending with the 27th day

board of trustees authorizing bills of sale made long after this alleged arrangement with Mr. Baird. Those were transactions by themselves, and there is no evidence that they had any relation to any undertaking or agreement between Sargent and Baird, or that the trustees of the corporation, other than Sargent and Baird, had any knowledge of the existence of such an arrangement even if it were made; and one of the principles of ratification is that the party ratifying must have knowledge of all the material facts.

Therefore, upon a consideration of all the evidence, and in view of the fact, as urged by the court below, that no transfers by the company to Baird were made for advances for a long period of time after

of September, 1892, the defendant Matthew Baird had acquired complete control and dominion over every asset belonging to the company, the only other property which had belonged to it being a quarry known as the Oak Hill quarry, which, according to Mr. Baird's statement, proving to be unprofitable, the company had virtually abandoned. During all of this time, then, the situation was this: Every dollar of money which came in on account of contracts which the company had, or on account of its products, was received by Mr. Baird, who charged himself with it in his account with the company; all products of the company were consigned to him, and were under his complete control, and all the other property of the company had been placed under his dominion by the action of the trustees in sanctioning the various papers which had been executed for the purpose of vesting him with the title to the property of the company. There was no further possibility of free agency on the part of the trustees, and the corporate functions of the company were virtually in a condition of utter paralysis. The majority of the trustees were either in his employment or otherwise under his influence; and the fact that they officially existed simply for the purpose of recording his will, protecting his interests and serving his purposes, abundantly appears from the fact that no business, with one or two trifling exceptions, was transacted at any of their meetings, except the diligent divesting of the corporation of its property in order to promote his interests. Although from the sixteenth day of April he had ceased to be a trustee of the corporation, and from the eighteenth day of May had also ceased to be a stockholder in the same, he stood for the company in all of the transactions which were had in the line of its business, gave directions in regard to its work, communicated instructions for the reduction of its working force, and, in short, managed and controlled its business, financial and otherwise, as if he had been an officer of the corporation vested with plenary powers to do as he pleased in the direction of its affairs. It is not difficult, in view of all this, to come to the conclusion that Mr. Baird, as far back as the month of March or April, 1892, was aware that the company was insolvent. That such insolvency existed at that time, and at all times subsequent thereto, is, I think, plainly apparent upon the proofs. The indebtedness of the company to Mr. Baird in April exceeded $100,000, and apparently rapidly increased from

this arrangement, and that no demand was made by Baird for such transfers based upon any previous agreement, it is evident that no such agreement was made, and the appellants cannot claim any rights founded upon its existence.

Without going into details, it appears that subsequent to the arrangement with Baird, he virtually transacted the business of the company, received all the output of the company, sold it, received the money, and advanced moneys for the carrying on of the work. It does not seem to have been a particularly successful adventure, since the indebtedness of the company to Baird kept increasing and increasing until in March or April, 1892, the company owed him something over $100,000, besides an amount of other indebtedness

that time on until the judgment hereinafter referred to was recovered by him against the company in the Supreme Judicial Court of Maine. Both Frank T. Sargent and Winthrop. O. Sargent swear that during this period Mr. Baird stated to them that the company was insolvent. They also state that bills had been incurred in connection with the equipment and operation of the quarries, which had not been paid, and of which payment was being demanded by the creditors, and that in some instances suits had been brought for the purpose of enforcing these claims. Some of these charges were ultimately paid by Baird, and no doubt augmented the rapidly increasing indebtedness of the company. According to the estimate given by the Sargents the assets of the company during this period were worth about $55,000 or $60,000, while its indebtedness, including Baird's claim, amounted to between $125,000 and $150,000, and of this sum $10,000 or $12,000 were represented by book accounts due by the company and by arrears of rent under the leases of both quarries, amounting to $5,000 or $6,000.

Without going into details it is sufficient to say that the proofs, taken as a whole, including the correspondence which passed between Mr. Baird and others in reference to the affairs of the corporation, satisfies my mind, not only that the company was insolvent at the time these various transfers were made, but that the fact was known to the officers of the company as well as to Mr. Baird, and that the transfers in question were made in contemplation of insolvency and with the intent to give Baird a preference over the other creditors of the corporation. Not the least significant fact tending to show what was in his mind as early as May, 1892, is the transaction by which he gave away his ninety-nine shares, nearly one-half of the capital stock of the corporation. No explanation of this is afforded beyond his desire to divest himself of his relation, as stockholder, to the company. No reason is given why he should have been so benevolent to those to whom the stock was transferred, nor is there any other explanation of his act worthy of acceptance, except that he knew the stock was worthless owing to the financial condition of the company, and that his surrender of it, for the purpose of relieving his efforts to secure himself from a well-founded ground of attack, involved no sacrifice of anything substantial on his part.

for merchandise used at the quarries, the wages of the men there employed, and the unpaid rent reserved in certain leases. At this time Mr. Baird concluded that his situation as a creditor of the company was not an absolutely safe one, and he demanded from Sargent a bill of sale of all the property of the company; and on the 19th of April, 1892, a bill of sale was executed by the president and secretary of the company of all its property and delivered to Mr. Baird. There is no evidence that the president and secretary were authorized by the stockholders to execute this bill of sale, or that they in any manner assented to its execution. It is claimed, however, that subsequently the stockholders, at a meeting at which all were not present, ratified its execution. Whether such ratification amounted to anything or not, it is not necessary to discuss or determine.

In reference to the transaction by which the company surrendered the Mount Haegen lease, and a new lease was taken by Baird in his own name, it is fair to say that on the 8th day of September, 1892, prior to the adoption of the resolution in question by the company and the surrender of the lease pursuant thereto, Mr. Baird wrote a letter to Frank T. Sargent, in which, among other things, he says: "In making out the lease of Mount Haegan, have Captain Goodwin make it out to me, and I will settle up his rent to date with him, and will file with the Sargent Granite Company writings; when the debt of the Sargent Granite Company is paid, I will transfer the lease over to the company. This, I think, I am entitled to receive as collateral security, with any other things the Company have, to secure me for money advanced by me to said company." While this letter shows that the purpose of the transaction was through this means, if possible, to secure the ultimate payment of Baird's debt, and thus, in a sense, not to misapply or embezzle the company's property, at the same time it gives emphasis to the complete and exclusive dominion which he had assumed over the property of the corporation, of which the quarry and its appurtenances substantially constituted all that was left.

About the 10th day of November, 1892, Mr. Baird determined to take actual possession of the Mount Haegen property, and to deprive the company of whatever semblance of control over, or management of, its property had remained to it. He went to the quarry, accompanied by his attorney, who announced to the assembled workmen, in Mr. Baird's presence and as his spokesman, that for all practical purposes the Sargent Granite Company had ceased to exist; that Mr. Baird had the lease of the quarry, and that from that day on the men would be in his employ, and that he would be responsible for their wages. From that time forward the business which had formerly been transacted by the Sargent Granite Company, or in its name, was transacted by and in the name of Matthew Baird. Shortly after this actions were commenced against the company by other creditors, attachments were procured in the State of Maine, and the workmen, whose pay had been largely in arrears, commenced lien suits for its recovery, some 120 proceedings having been instituted for this purpose. Doubts having been

It appears from the evidence that, about this time, Baird came to the conclusion that his position, as stockholder and treasurer and secretary and assignee by virtue of the bill of sale of all the property of this company as security for an alleged indebtedness, was somewhat inconsistent and he resigned as director, secretary and treasurer, and transferred his stock to certain of his employees. One of said employees, named Clark, was elected secretary and treasurer in Mr. Baird's place, and another named Harrington was elected director in his place. It is claimed, upon the part of the appellants, that thus the confidential relations existing between himself and the company were severed, and that the inhibitions of the statute no longer applied to him. The business of the company, however, was conducted in

expressed as to the validity of the various bills of sale and assignments which had been made by the company to him, Mr. Baird was advised for his protection to institute an action against the company to recover the amount of his debt, and this was brought about and accomplished in the following manner:

At that time Mr. George F. Harriman, as a member of the firm of Harriman & Fessenden, was the attorney for both the Sargent Granite Company and Mr. Baird. Acting upon his instructions, his brother, Mr. James Harriman, an attorney residing in Belfast, Maine, commenced an action in that State against the company in the name of Matthew Baird, and caused an attachment to be issued therein, and levied upon all of the property in that State which had belonged to the company and which had been included in the bills of sale which had been given to Mr. Baird. It was a matter of considerable importance to the latter that personal service of process should be made upon an officer of the corporation in time to have the case heard at the January term of the Supreme Judicial Court of Maine. To that end Clark, the secretary and treasurer of the company, was instructed by Mr. Harriman and Mr. Baird to go from the city of New York to Belfast for the purpose of having the summons in the action served upon him as an officer of the company, and Mr. Baird gave him the money for the expenses of the trip. Following the directions which had been so given, Mr. Clark went to Belfast, and immediately upon his arrival waited upon Mr. James Harriman, who was the attorney for Baird in the suit, and was informed by him that the sheriff would shortly call and make the service, which was done. Clark thereupon returned to New York and reported to Mr. George Harriman and to Mr. Baird what had taken place. Before he left Belfast, however, he placed the papers which had been served upon him in the hands of an attorney by the name of Thompson, and told him to take charge of them for the company. He had never met Thompson before, but was introduced to him upon that occasion by Mr. James Harriman. Thompson appeared in the action for the company; there was no contest, however, of the claim, and it appears that he was paid for his services by Mr. George Harriman, who in turn collected the amount from Mr. Baird.

the same manner as before. Baird directed all its affairs and assumed the same control as he had previously exercised, and the evidence of Harrington shows, beyond dispute, that the transfer of the stock was not absolute, but that it was understood by the transferees that they were acting for Baird and in his interest, and that they were not the absolute owners of the stock, they having paid nothing therefor. He says that Baird told him that anything that would come from the stock after he (Baird) was paid would be his, and that if any profit or income came from it, it would be his to get the profit on it. In other words, Harrington was to have anything that was left after Baird was paid, but he was to have no right to receive anything until that event occurred. It is manifest from the

On the opening of the January term there was formal proof made by Baird before an auditor, who reported as due the full amount of the claim, but upon the intervention of one or more creditors of the company, the court sent the report back to the auditor, who again made a report differing but little, if any, from the first. Whereupon judgment was entered on the 21st day of January, 1893, in favor of Matthew Baird and against the company for the sum of $146,618.65 and the taxable costs, amounting to $745.66. This recovery simply intensifies the conviction that during the year 1892 the company was utterly and hopelessly insolvent. On the 25th day of January, 1893, execution was issued upon the judgment, and the attached property was sold to the defendant William P. Baird for a sum not exceeding in all about $2,000. It was sold subject to the lien attachments, amounting to about $20,000, which, it appears, were subsequently paid off by Matthew Baird. It was also sold subject to attachments which were obtained in other suits. The proofs are silent as to what became of these other attachments. The sheriff testifies that he was indemnified upon the sale, and that he had been advised by competent counsel that the attachments were invalid. At all events, we find, as the crowning act of this series of transactions between the company and Matthew Baird, a sale of all of its property for a sum of money which seems absurdly inadequate, which was applied exclusively upon its indebtedness to Baird, who was the actual purchaser at the sale, and who now claims absolute title to all of the property so sold. William P. Baird is the son of Matthew Baird, and, although title to the property so sold was taken in his name, it appears, and, in fact, is admitted by the father, that he (the father) is the real owner of the property, and responsible for its appropriation and use.

The company having been thus stripped of all its property, and being unable to pay any of its creditors, has passed into the hands of a receiver, and this action has been brought for the purpose of setting aside said transfers so made to Matthew Baird, and of compelling him and William P. Baird to deliver over to the receiver all of the property obtained by them under the execution sale, and to account for such property and the profits arising therefrom. Section 48, chapter 564 of the Laws of 1890, known as the Stock Corporation Law, provides, among other things, in reference to such a corporation as the one in question that "No officer, director or

manner in which, and the persons to whom, these transfers were made, the fact that they took the place in the board of trustees previously occupied by Baird, the fact that the latter still managed the company, notwithstanding the alleged change of relationship, and the clear intimation to Harrington that he was to have no interest in the stock until the indebtedness to Baird was paid, that Baird transferred this stock, not in good faith, but for the purpose of removing the supposed disability. We do not think that such a transfer (not being made in good faith, and Baird not parting with the absolute ownership of the stock) could relieve him from the disability which attached to the position of a stockholder of this company.

It further appears that other bills of sale were executed and that

---

stockholder thereof shall make any transfer or assignment of its property, or of any stock therein, to any person in contemplation of its insolvency; and every such transfer or assignment to such officer, director or other person, or in trust for them or for their benefit, shall be void." The courts have construed similar words in another statute to import, not only insolvency that was imminent or that was expected to arise at some future period, but also a condition of present insolvency. (*Robinson* v. *Bank of Attica,* 21 N. Y. 406; *Paulding* v. *Chrome Steel Co.,* 94 id. 334.) In order that a cause of action may arise under this provision of the statute, two things are essential: "There must be a transfer or assignment of property, and this must be done in contemplation of the insolvency of the corporation. Insolvency has been differently defined in different courts. By some it is said to be a condition in which the value of the assets is less than the amount of liabilities. By others it is said to be a general inability to pay obligations as they become due in the regular course of business. Many a business is, at times, insolvent, according to the first of these uses of the word, although it is prosperous, and no one thinks for a moment that any necessity will arise for applying its property to the payment of its liabilities by process of law. There is no necessity for the law to interpose in behalf of its creditors, so long as the corporation is able to meet its obligations promptly. The use of this word, in the statute under consideration, is the latter use. (*Brouwer* v. *Harbeck,* 9 N. Y. 589; *People* v. *Excelsior Gas Light Co.,* 3 How. Pr. [N. S.] 137.) The statute is meant to apply, when it becomes apparent to those assigning or transferring its property, that the corporation is in the condition described in the latter of these definitions, so that the question confronts them: How are the assets of the corporation to be used, not in carrying on its business, but in meeting its obligations?" (*French* v. *Andrews,* 81 Hun, 272.)

I do not think that upon the facts of this case there can be much doubt that the Sargent Granite Company, at the time when these preferential transfers were made, was not only insolvent, but was known to be so by its officers, and that it was in view of that condition, and in contemplation of such insolvency, within the meaning of the statute, that the transfers in question were made.

when Baird thought it necessary for the protection of his interests to bring an action in the State of Maine against this corporation, the secretary and treasurer of the company went to the State of Maine at his (Baird's) expense and request in order that he might be served with process in that action—another indication that these persons were put into the corporation by Baird and were his representatives and tools. It cannot be that by such an arrangement the disability imposed by statute upon stockholders and officers of corporations can be avoided.

That at the time of receiving these bills of sale and the commencement of this action Mr. Baird was aware of the insolvency of this company is amply established by the evidence, although he

But had it not been for an amendment of the statute, a very serious question would have arisen whether the judgment recovered in the State of Maine, by the defendant Matthew Baird, against the corporation, could be successfully attacked. Until the passage of chapter 688 of the Laws of 1892, amending the Stock Corporation Law, the decisions of the courts seemed uniformly to uphold acts on the part of officers of insolvent corporations which were plainly intended to facilitate the efforts of creditors to secure preferential liens by judgment. (*Varnum* v. *Hart*, 119 N. Y. 101; *French* v. *Andrews*, 145 id. 441.) But chapter 688 of the Laws of 1892, which took effect on the 18th day of May, 1892, amended section 48 of the Stock Corporation Law, above referred to, so that the portion germane to the present discussion was then made to read as follows: "No conveyance, assignment or transfer of any property of any such corporation, by it or by any officer, director or stockholder thereof, nor any payment made, *judgment suffered*, lien created or security given by it or by any officer, director or stockholder, when the corporation is insolvent, or its insolvency is imminent, with the intent of giving a preference to any particular creditor over other creditors of the corporation, shall be valid. Every person receiving, by means of any such prohibited act or deed, any property of the corporation, shall be bound to account therefor to its creditors or stockholders or other trustees."

It will thus be seen that the suffering of a judgment by an insolvent corporation, with the intent of giving a preference, is brought within the prohibition of the act, the Legislature having been doubtless influenced in its action by reason of the decision to which I have referred. This amendment has undergone judicial construction in the case of *Milbank* v. *de Riesthal* (82 Hun, 537). At page 544 Mr. Justice PARKER, delivering the opinion of the court, says: "The mere fact that the officers of the corporation do not oppose the creditor in his effort to get the judgment, but remain passive, is not alone sufficient to require the inference that the judgment was suffered with the intent of giving such creditor a preference. But the inference may be supported on additional evidence of an affirmative character, tending to show the existence of such a desire on the part of the officers of the corporation having knowledge of the situation.

claims he was unaware of the existence of any debts except his own. It appears that he knew that the company was in debt for rent of its quarries, and that it had no money with which to pay such rent; and he also knew that it was indebted for merchandise used at the quarries and also for wages, and that the company was desirous of getting machinery and had no money with which to get it, except such as it should get from him. And he knew further that he was taking from this company, by absolute bills of sale, every bit of property which it owned, and that at any moment the business of the company could be stopped by him. It is clear that he must have known that the company was absolutely insolvent and that it had no hope of continuing its business except by means of

Evidence tending to prove such a desire on the part of the officers may consist of acts done or words spoken under such circumstances as manifest a wish or plan to effectuate a preference in behalf of the prosecuting creditor."

There can be no doubt of the fact that there existed the strongest kind of a desire and purpose on the part of the officers of this corporation to facilitate the defendant Matthew Baird in prosecuting his action to judgment. On his bidding and at his expense the secretary of the company went into the State of Maine for the purpose of having process served upon the corporation through him. Not only this, but the secretary placed the papers in the hands of an attorney whom he had never met before, who was introduced to him by the attorney for the plaintiff, and who was ultimately paid by the latter. There could not well be a plainer case of suffering a judgment in order to give a preference than this. It has been argued by the learned counsel for the defendants in this action that because this judgment has been duly recovered in the courts of the State of Maine it is beyond the reach of any attack here. Precisely the same question arose in the case of *McQueen, Receiver,* v. *New* (87 Hun, 206), and was decided adversely to this contention. The defendant, who profited by the procuring of the judgment, is before the court, and can be compelled to account for all that he has obtained under it. It is not necessary that the judgment should be set aside, which, as it was recovered in a foreign tribunal, this court would have no power to do; but as the defendant Matthew Baird has through its agency acquired a preference forbidden by our statutes, it is to be regarded as a means employed to accomplish a forbidden end; and the property, acquired through the use of such means, is by virtue of our statute affected with a trust in the hands of such defendant in favor of those from whom it has been unlawfully taken, and this court has abundant power to compel him to account therefor.

It follows, therefore, that there must be judgment in favor of the plaintiff against the defendants, declaring such transfers and acts, intended to give a preference to the defendant Matthew Baird, to be null and void, and requiring the defendants to account to the plaintiff for all of the property of the Sargent Granite Company acquired by them under any of said transfers, or by virtue of proceedings under the execution sale had under the Maine judgment, with costs.

moneys which might be advanced by him. It may be that prior to the time of taking security for his indebtedness, which commenced in April, 1892, he may have hoped that the business of the company would be prosperous, which led him to advance large sums of money until they amounted to about $100,000. But it then appears that he became alarmed at the condition of the company and began to seize everything in sight. He then knew, as already stated, that the company was in arrears for rent of the property necessary for the conduct of its business; and that it had not the requisite tools and machinery to carry on its business, and knowing these facts, and, therefore, knowing that the corporation could not continue its business, he proceeds to become the owner of the lease of the only quarry of the company which it was thought might be successfully worked.

With all these facts and circumstances before us, it seems impossible to come to any other conclusion upon the questions of fact than that reached by the court below.

The judgment should be affirmed, with costs.

WILLIAMS, PATTERSON, O'BRIEN and INGRAHAM, JJ., concurred.

Judgment affirmed, with costs.