## BIELASKI v. NATIONAL CITY BANK OF NEW YORK.

District Court, S. D. New York.
Jan. 25, 1932.

Lewis, Marks & Kanter, of Brooklyn, N. Y. (Charles H. Kelby, of New York City, and Lloyd B. Kanter, of Brooklyn, N. Y., of counsel), for plaintiffs.

Shearman & Sterling, of New York City (Walter K. Earle, of New York City, of counsel), for defendant.

PATTERSON, District Judge.

This is a suit by the trustees in bankruptcy of Benedict Metal Works, Inc., a New York corporation, to recover a payment received by the defendant from the bankrupt. The plaintiffs say that the payment was a preference under section 15 of the New York Stock Corporation Law (Consol. Laws, c. 59). The action is brought as one at law, and a jury was waived by stipulation in open court.

The case is the result or one of the results of a series of forgeries by John J. Sparler. Sparler was the vice president and treasurer of the Benedict Metal Works and was in complete control of its business. Late in February, 1928, he asked the bank to allow the company a line of credit for $100,-000. One of his representations was that the company then had lines of credit with only two other banks, the Bronx Borough Bank and the Corn Exchange Bank, each of them being for $100,000. The bank agreed to extend the desired credit against the company's notes to be indorsed by Sparler or to be secured by accounts receivable. Between March 1st and March 14th it made loans against three ninety day notes of the company indorsed by Sparler, each for $25,000. The proceeds were deposited in the company's account with the bank which was opened at the same time.

Trouble began almost immediately. Word came to the bank on March 15th that the company owed $50,000 to a bank in Mt. Vernon. One of the officers forthwith taxed Sparler with misrepresenting the situation and demanded collateral security. Accordingly, a day or two later he brought the bank six notes, each for $10,000, purporting to bear the signature of G. A. Ball as maker. These notes were spurious. Ball happened to be acquainted with an officer of the bank and was known to be a man of wealth. On being shown the notes he stated that the signatures were not his. Two officers of the bank got in touch with Sparler the same day, March 22d, informed him that Ball had repudiated the collateral notes, and demanded immediate repayment of the loans made to the company. Sparler protested that the Ball notes had come to him in a legitimate transaction, but acquiesced in the demand for prompt liquidation. He forthwith gave the bank a check for the entire balance of the Benedict account, $25,456.50, which was the remnant of the $75,000 loaned by the bank and placed in the account, and he promised that the balance of the loans would be paid without delay.

Two days later, March 24th, Sparler went to the bank with a cashier's check of the Bronx Borough Bank for $49,000, payable to himself. The bank took pains to find out by telephone that the check was genuine. Sparler, having indorsed the check individually and also in the name of the company, gave it to the officer in charge of the matter, receiving in exchange the six Ball notes. While the officer was attending to having the three Benedict notes stamped as paid, Sparler proceeded to burn the Ball notes on the spot and then hurried out. Barring a small payment by the bank to the company, representing the unearned discount on the notes, this was the entire transaction. The proof shows that the $49,000 cashier's check which Sparler turned over to the defendant had been purchased by giving to the Bronx Borough Bank a check on the company's account for $19,000 and a cashier's check of the Mt. Vernon Trust Com-

pany for $30,000. The latter check had been purchased by Sparler out of his own funds.

For some time prior to this transaction the company had been in poor condition. Due to false bookkeeping and to widespread forgeries committed by Sparler, however, it kept up appearances and was able to obtain financial accommodation. Its affairs were to some extent intertwined with those of Sparler, the resources of one being used in times of stress to bolster up the other. Sparler had formerly been a man of means, but he had taken on a real estate venture that proved to be ruinous and led him into desperate and criminal measures in an effort to save himself. The proof shows that as early as June, 1927, Sparler was informed by his secretary that the company's liabilities exceeded the assets. He met this situation by ordering the inventory to be written up at twice its actual value. These tactics of inflating the inventory were repeated in June, 1928. The forgery system was that notes or acceptances of fictitious customers would be forged and then either given to banks as collateral for Benedict notes, as was done with the defendant, or else discounted directly with banks. This had been going on for some time prior to March, 1928. Sparler would pay off the obligations before maturity, raising the money by working the scheme on some other bank, and would thus get back the forged paper and avoid detection. The first trouble he seems to have had was with the Ball notes given to the defendant. At the time of this transaction, the Benedict Company had assets of about $425,000 and liabilities of about $517,000, showing a deficit of $92,000. The current assets were about $117,000, whereas all of the liabilities, $517,-000, were current. Fictitious paper discounted with banks accounted for $193,000 of the liabilities.

Sparler's resourcefulness, however, kept the company in business for five months more. Shortly after the transaction with the defendant, other banks came down upon the company and demanded immediate settlements. Sparler mustered from his own resources and those of his wife over $200,000, and he raised an additional $200,000 by placing a mortgage on the property of another corporation in which he was interested. With the funds so raised the banks were paid off, the immediate pressure relieved, and the difficulty tided over. Later on an effort was made to increase the capital stock and get in new money, but nothing seems to have come of this. During this time, from March to August, the company continued its manufacturing business, though operations went on at a loss. It paid off many of its ordinary trade obligations as they matured, and it kept up its advertising. In August creditors began to investigate, and a petition in bankruptcy was filed on August 24, 1928.

The trustees have no rights against the bank under the Bankruptcy Act, since the alleged preference occurred more than four months prior to bankruptcy. They base their suit upon section 15 of the New York Stock Corporation Law (Consol. Laws, c. 59). At the time of this transaction, the portion of that statute relevant to the case read as follows: "No conveyance, assignment or transfer of any property of any such corporation by it or by any officer, director or stockholder thereof, nor any payment made, judgment suffered, lien created or security given by it or by any officer, director or stockholder when the corporation is insolvent or its insolvency is imminent, with the intent of giving a preference to any particular creditor over other creditors of the corporation, shall be valid, except that laborers' wages for services shall be preferred claims and be entitled to payment before any other creditors out of the corporation assets in excess of valid prior liens or incumbrances."

The section was amended in 1929 so as to protect creditors without notice or reasonable cause to believe that the transfer would result in a preference. Laws of 1929, c. 653. It is agreed that this amendment has no bearing on the rights of the parties arising from a transaction that occurred before the amendment became effective (Matters v. Manufacturers' Trust Co., 54 F.(2d) 1010, 1014, decided in November, 1931, by the Circuit Court of Appeals of the Second Circuit); further, that, under the act as it was in 1928, the state of mind of the creditor who received the transfer was of no moment (Brouwer v. Harbeck, 9 N. Y. 589; Baker v. Emerson, 4 App. Div. 348, 38 N. Y. S. 576). And although the suit is to recover the full $75,000 received by the defendant, the trustees conceded on the trial that the bank was entitled to rescind the transaction for fraud, and that they have no just claim to the $25,456.50 which the bank regained out of the very money loaned by it. Cunningham v. Brown, 265 U. S. 1, 11, 44 S. Ct. 424, 68 L. Ed. 873; Fisher v. Shreve, Crump & Low Co. (D. C.) 7 F.(2d) 159. The dispute is over the remaining $49,000 received by the bank.

The bank makes the point that, of the $49,000, the sum of $30,000 represented Sparler's money and not that of the bankrupt

company, and that as to this sum there can be no recovery. As already pointed out, the cashier's check was made payable to Sparler, and only $19,000 of the $49,000 came from the company. The other $30,000 came from Sparler personally.

It seems clear that to the extent of the $30,000 there was no depletion of the bankrupt's estate, and therefore no preference. The fact that Sparler may have been indebted to the company at the time did not make his money that of the company. A similar situation came up in Mason v. National Herkimer County Bank (C. C. A.) 172 F. 529, affirmed in 225 U. S. 178, 32 S. Ct. 633, 56 L. Ed. 1042. There the defendant held a note made by the bankrupt and indorsed by another concern. The indorser paid the note with its own funds. It was indebted to the bankrupt at the time and received credit for the payment in reduction of such indebtedness. Both the Circuit Court of Appeals of this circuit and the Supreme Court held that there was no diminution of the bankrupt's estate, and that there was no preferential transfer of its property. In this case it is true that, in handing the check over to the defendant, Sparler indorsed the company's name under his personal indorsement. There is no testimony as to his reason for doing this, if he had any reason. It may be that he wanted to earmark the payment as made against the company's note or that he wanted to add on the company's contingent liability for payment. In any event I am of opinion that the mere indorsement of the corporate name, effective for only an instant of time, did not make the payment that of the company rather than of Sparler. As to the $30,000 which was Sparler's money all along, there can be no recovery. The remaining question concerns the $19,000 of corporate funds transferred to the defendant.

In an action to recover a preference under section 15 of the Stock Corporation Law (Consol. Laws, c. 59), there are two essentials to be established: First, that, when the transfer was made, insolvency of the debtor corporation was either existing or imminent; and, second, that there was an intent by the debtor to give a preference. Insolvency under this statute does not refer to an excess of liabilities over assets; it means an inability to pay debts in the ordinary course of business. Brouwer v. Harbeck, supra; Olney v. Baird, 7 App. Div. 95, 40 N. Y. S. 202. "The test is a general inability on the part of the corporation to pay its obligations as they become due in the regular course of business." Abrams v. Manhattan Consumers' Brewing Co., 142 App. Div. 392, 126 N. Y. S. 844, 846. In the present case there was a condition of present or impending insolvency on March 24, 1928. The company had $517,000 to meet in the near future, and only $117,000 in liquid assets wherewith to pay. It is true that it paid its more pressing debts, those in which there was a likelihood of jail for Sparler unless payment was made. But it did so only by means of cash advances made or procured by Sparler, and it was still indebted for the same amount. The company had been conducting business at a loss for some time and was in a precarious condition. The resolution of the stockholders' meeting in April, 1928, recited that the company was in financial difficulties. The evidence as a whole establishes the inability of the company to meet its debts in the ordinary course of business. A concern that is solvent does not raise money by means of forged paper.

The intent to prefer the creditor who is paid is not satisfied by the mere fact of payment at a time when there is insufficient to pay all creditors. Under the New York statute, allowance is made for the fact that occasionally corporations which are apparently insolvent are saved by prudent management of their affairs. Payments are valid when made by officers who in good faith believe that the corporation, though insolvent, will thereby be relieved of embarrassment and enabled to enter on a more prosperous career in the course of which all creditors will be paid. Paulding v. Chrome Steel Co., 94 N. Y. 334; Milbank v. De Riesthal, 82 Hun, 537, 31 N. Y. S. 522; Swan v. Stiles, 94 App. Div. 117, 87 N. Y. S. 1089; Van Slyck v. Warner, 118 App. Div. 40, 103 N. Y. S. 1, affirmed in 192 N. Y. 547, 84 N. E. 724. The intent to prefer requires a showing that the corporation or its officers making the payment knew or expected that the making of the payment would result in the other creditors not being paid. "In other words, the question is whether the payment was made in contemplation of insolvency and winding-up as an impending fact, or in contemplation of continuing business in good faith." Cardozo v. Brooklyn Trust Co. (C. C. A.) 228 F. 333, 334. But the officers in making the payment must actually believe that the business will be continued, and that all creditors will be paid. "It is still a preference if a debtor, knowing that he is insolvent, selects one creditor, though he believes that he may not go to the wall, if the dice fall right.

He must actually believe that the gods will smile; it is not enough that their faces are inscrutable." Matters v. Manufacturers' Trust Co., supra.

At the time of this payment Sparler knew of the insolvency of the company. He must also have realized that all the other creditors would not be paid unless matters should take a sudden turn for the better, and he had no substantial reason to anticipate such a radical improvement. He made the payment because he was aware that otherwise his forgeries would straightway be discovered, and that the consequences to him would be unpleasant. It was not a payment in the ordinary course of business, but an extraordinary payment, dictated by the personal necessities of Sparler more than by any other consideration. As to the intent of the debtor corporation, the same inference should be drawn as in cases where payments are made on debts for which corporate officers are secondarily liable, at a time when the corporation is clearly insolvent. See Grandison v. Robertson (D. C.) 220 F. 985, affirmed in (C. C. A.) 231 F. 785; Kolkman v. Manufacturers' Trust Co. (C. C. A.) 27 F.(2d) 659. I think that an intent to prefer existed on the part of Sparler.

It follows that, to the extent of $19,000 (less the discount later repaid to the bankrupt), the payment was a preference under the Stock Corporation Law, and that the plaintiffs are entitled to judgment for this amount. Findings of fact and conclusions of law in conformity with this opinion may be submitted.