**BIELASKI et al. v. FORDHAM NAT. BANK IN NEW YORK.**

District Court, S. D. New York.
April 29, 1935.

Lewis, Marks & Kanter, of Brooklyn, N. Y. (Lloyd B. Kanter, of Brooklyn, N. Y., of counsel), for plaintiffs.

Miller, Bretzfelder & Boardman, of New York City (Bertram Boardman, of New York City, of counsel), for defendant.

RIPPEY, District Judge.

This case was brought on in regular order on the law calendar before the court and jury. At the close of the trial, each party moved for a direction of verdict in its favor. Thereupon proceedings were had whereby the parties stipulated that the jury should be discharged and the case should be decided by the court upon the law and the facts as though the case had been tried before the court without a jury. The case was accordingly submitted to the court.

The defendant, Fordham National Bank in New York, was a national banking association with offices in the borough of the Bronx, New York City. After 1928 it merged with the Bronx Trust Company. The Benedict Metal Works, Inc., was a New York state corporation with principal place of business in the borough of the Bronx, city of New York, with an authorized capital stock of $100,000 divided into 5,000 shares of common stock of the par value of $10 each and 5,000 shares of preferred stock of the par value of $10 each, and such capital stock structure continued to August 1, 1928. Of the outstanding stock, John J. Sparler held 1,250 shares of the common stock and 600 shares of the preferred stock, and he was the vice president, treasurer, and general manager of the corporation: Marian G. Sparler, his wife, held 2,500 shares of the common stock and 500 shares of the preferred; Bernard Benedict held 100 shares of the common stock, and was president of the corporation and looked after its manufacturing activities; two other members of Sparler's family held 1,190 shares of the common stock. Sparler was in sole charge and management of all of its financial activities. A petition in bankruptcy was filed against the corporation on August 24, 1928, and it was adjudicated bankrupt on September 8, 1928. On October 16, 1928, the plaintiffs were elected trustees in bankruptcy, qualified, and entered upon the discharge of their duties. Charles E. Scofield died prior to the trial, but Bielaski and Winter have continued as trustees.

Previous to 1928 Sparler had difficulty in financing the business of the company as well as his own business operations and was a large borrower both on his own account and on the account of his several corporations. He had business dealings with the defendant in 1927 on his personal account, and early in 1928 became a director of defendant, and continued as such director until shortly before the bankruptcy of Benedict Metal Works, Inc. In financing the Benedict Company, as well as various other enterprises in which he was interested, for at least three years before 1928, Sparler had resorted to means by which loans and discounts were obtained from several banks on spurious paper and on false financial statements. False receivables, discounted at one bank, would be taken up before maturity with the proceeds of direct loans or of false receivables discounted at other banks. Sparler was able to keep a step ahead of detection until March, 1928, whereupon the irregular transactions ceased. Upon substantially the same evidence as that presented in the case at bar, this court held in Bielaski et al. v. National City Bank of New York, 58 F.(2d) 657, that a payment of the Benedict Metal Work, Inc., to the defendant City Bank of $19,000 on March 24, 1928, was made while the Benedict Company was insolvent and was void as a preferential transfer under section 15 of the Stock Corporation Law of the state of New York (Consol.Laws, c. 59). This decision was

affirmed (C.C.A.) 68 F.(2d) 723. On March 31, 1928, moneys owing to various banks on the notes of the Benedict Company aggregated $282,500, and additional sums were owing on fictitious receivables, all with Sparler's indorsement. Of this sum, $245,153.05 was paid to the Corn Exchange Bank, the Bronx Borough Bank, the Cosmopolitan Bank, the Mount Vernon Trust Company, and the American National Bank & Trust Company on unmatured obligations. The sum of $215,088.28 of moneys so paid was advanced to the bankrupt by Sparler and Freedman or the Frigate Corporation, which they owned. This transaction did not decrease the obligations of the bankrupt by the amount so advanced; there was merely a shift of creditors. On March 31, 1928, the bankrupt's liabilities exceeded its assets on its own showing by nearly $100,000; its current liabilities exceeded its current assets by $400,000. Included in its "current" liabilities were nearly $300,000 on unmatured paper of the above-mentioned and other banks. It was clearly upon the record here insolvent on that date within the meaning of the provisions of the Bankruptcy Act, and has been held by this court, as above indicated, to have been then insolvent within the meaning of the New York State Corporation Law, and in that holding I concur.

In this case, plaintiffs seek to recover three alleged preferential payments to defendant of $4,132.30 on May 11, 1928, arising out of a forged trade acceptance purporting to be an obligation of the National Brokerage Company, discounted by defendant on January 31, 1928, and due May 25, 1928, of $11,650 on May 24, 1928, arising upon a forged note of one Ball discounted March 12, 1928, and due June 21, 1928, and of $11,650 on June 20, 1928, arising out of another forged note of Ball discounted by defendant on March 12, 1928, and due June 21, 1928.

In January, 1928, Sparler, then being a director of defendant and a borrower on his own account, asked defendant for a line of credit for the Benedict Metal Works. The bank granted credit on the corporation's direct line of $32,500 and agreed to discount a certain amount of customers' paper. On January 16, 1928, the company opened a general checking account by the deposit of $28,608.26, which included $25,000 which it borrowed from

defendant on its own paper. It borrowed the further sum of $7,500 on February 17, 1928, and this was credited to the account. On January 31, 1928, the proceeds of the trade acceptance was credited to the account, and on March 12, 1928, the proceeds of the two Ball notes were also credited. Deposits of other moneys belonging to the Benedict Company were made from time to time. Between January 16, 1928 and May 23, 1928, inclusive, 13 credits to the checking account were entered by defendant aggregating $148,864.06, twenty-four checks were charged to the account of an aggregate sum of $135,531.94, leaving a balance on May 23d of $13,332.12. On June 18, 1928, appears a deposit of $7,500 and on June 20th $12,000, which, added to the former deposits, makes an aggregate deposit to this account of $168,364.06. Between May 23d and June 20th, inclusive, nine withdrawals were charged, aggregating $32,365.20, making the total withdrawals $167,897.14, and leaving a balance to the credit of the Benedict Company on May 21, 1928, of $466.92. This balance was further depleted by withdrawals, so that, at the time of the adjudication in bankruptcy, there was a credit balance of $129.84. These facts appear from the books of defendant and indicate the course of financial transactions between defendant and the bankrupt. Thus, as to all of these financial transactions, the relation of debtor and creditor existed between the bank and the bankrupt, and the evidence clearly establishes that it was so intended by the parties. The two Ball notes were charged into this account on consent of the corporation before maturity. The trade acceptance was not paid by charging it into the account.

The board of directors of the bankrupt empowered Sparler to borrow the $32,500 and to procure discounts from the bank. Thus, upon borrowing the money and discounting the paper, even though it was spurious, the corporation became liable to the bank for repayment. The funds procured therefrom were used by the corporation for its own purposes, and the bankrupt could not refuse to pay on the ground that part of the paper was forged.

It makes no difference whether the trade acceptance and the Ball notes were genuine or spurious; in either case, defendant gave the corporation the money

in good faith on the strength of the corporation's indorsement by Sparler as its treasurer. It had no notice that there was anything wrong with the paper or that there was any limitation on Sparler's authority to act for the corporation. It had, in fact, written notice of his authority to act. It knew neither Ball nor the National Brokerage Company. Prima facie, as well as actually, the corporation was bound by his act when it received the benefits (Vought v. Eastern. B. & L. Ass'n, 172 N.Y. 508, 517, 65 N.E. 496, 92 Am.St.Rep. 761; Davies v. Harvey Steel Co., 6 App.Div. 166, 170, 39 N.Y.S. 791; Dill & Collins Co. v. Morison, 159 App.Div. 583, 586, 144 N.Y.S. 894; Tyler v. Anglo-American Savings & Loan Ass'n, 30 App.Div. 404, 408, 52 N.Y.S. 77), and the loans were a bona fide debt of the corporation to the bank.

On April 28, 1928, defendant discovered the spurious character of the trade acceptance when the National Brokerage Company wrote that they had issued no trade acceptance and owed the bankrupt only $67 as of April 21, 1928, and immediately afterwards that the Ball notes were questionable. On further inquiry they learned of some of Sparler's other questionable transactions with other banks, and thereupon required Sparler to at once take up this paper. He denied that the paper was irregular, but acquiesced in the demand. On May 11, 1928, he drew a check on the bankrupt's account in the Nassau National Bank of Brooklyn for $4,132.22 and took up the trade acceptance. This transaction was not put through the checking account in defendant's bank. Payment appears only on the note ledger of defendant. The money paid was the money of the bankrupt. The payment was made 14 days before the due date. On May 17, 1928, the bankrupt deposited in its checking account with defendant the sum of $13,044.60. In this item of deposit was a check for $12,500 drawn by the bankrupt on its own funds on deposit with the Nassau National Bank of Brooklyn, and it was collected by defendant in due course. Without that item, the credit to the checking account was $1,980.68, and plaintiffs claim that the check was deposited for the express and sole purpose of taking up one of the Ball notes. However, the deposit was a general deposit, and went into the general funds of the bank, and the defendant did not charge the account with the $11,650 note until May 24, 1928. In the meantime defendant had cashed through this account four checks of the bankrupt aggregating $430.52. The note was charged to the account 28 days before it was due. On June 18, 1928, there was a balance to the credit of the account of the bankrupt at the bank of the sum of $116.92. On June 20, 1928, the bankrupt deposited its check on its own funds in the Nassau Bank for $12,000, and on the same day defendant charged the account in its bank with $11,650, the amount of the second Ball note. The unearned discounts on the two Ball notes was not credited to the account. Thus defendant procured payment of all of the spurious paper, but has never received payment of the $32,500, owing on the bankrupt's own notes, and at no time did it press for payment of the genuine notes.

■ If these payments of the forged paper are to be treated as separate preferences, by the payment of $4,132.22 defendant received .069 per cent. of its claim against the bankrupt due or to become due at the time of payment, by the payment of the first item of $11,650 it received .209 per cent. on its claim, and by the payment of the last note .264 per cent. of its indebtedness. These payments, taken separately or as a whole, enabled defendant to obtain a greater percentage of its claim than other creditors of the same class, and I am satisfied that the bankrupt was insolvent at the time the payments were made. It can be asserted with equal certainty that the bankrupt intended to prefer defendant by making the payments in question. These payments saved the impending crash as other payments of worthless paper had saved earlier crashes of the corporation. Under section 15 of the New York Stock Corporation Law as it stood in 1928, it made no difference whether the bank knew of the condition of affairs of the debtor or that the payments were creating a preference. The fact of insolvency, present or imminent, the preferential payment, and the intent of the debtor to prefer was all that was necessary. Dalziel v. Rosenfeld, 265 N.Y. 76, 191 N.E. 841; Grandison v. Robertson (C.C.A.) 231 F. 785.

On the question of insolvency defendant strenuously insists that the payment of the bankrupt's obligations to the banks holding questionable paper on or before

April 3, 1928, of $265,200 reduced its obligations to a point where it became solvent and that its obligations should be further reduced by writing off other loans made by Sparler on fictitious paper. This is sort of blowing hot and cold. All of these loans were carried on the bankrupt's books in the special account of Sparler, and it appeared from the books that the bankrupt owed Sparler in most cases and not the banks. If it was necessary for the bankrupt to pay the $265,200 to reduce its obligations, it was equally necessary to pay the other loans. Defendant's claim is that Sparler and Freedman advanced $215,000 of the $265,200 on a stock subscription effective as of April 3, 1928. The money was, in truth, mostly advanced by the Frigate Holding Corporation, Inc., by mortgaging its property. It gave a check to Sparler and Freedman for $158,701.28 on March 31, 1928, which was indorsed over to the bankrupt and by it to the Bronx Borough Bank, and on April 4, 1928, the same corporation gave another check for $50,750 to the same order and by the same indorsements it passed to the Cosmopolitan Bank. On the books of the bankrupt these items appear to be loans by Sparler. .

On April 3, 1928, a meeting of all the directors and stockholders of the company was held. In the minutes of the meeting appears a recitation that the corporation is in financial difficulties and owes the Bronx Borough Bank and the Cosmopolitan Bank moneys which "it is not in a position to pay and said banks have threatened to take immediate steps to liquidate the business of the corporation to enforce payment unless said indebtedness is liquidated forthwith," and that Sparler and Freedman were willing to advance $215,088.28 to liquidate that indebtedness on receipt of obligations of the Benedict Metal Works, Inc., satisfactory to them. The resolution authorized Sparler and Freedman and the secretary of the company to do whatever might be necessary to effectuate the transaction and to increase the capital stock of the company to $500,000.

■ Defendant claims that Sparler and Freedman agreed in writing between themselves to take stock of the corporation out of this increase and thus wipe out its debt to them created by the advance, and that this result was as effectually accomplished as if the stock had been actually issued. The importance of successfully maintaining that position lies in the possibility of thus showing that the bankrupt was then solvent. The agreement, however, could not be produced on the trial and Freedman did not testify. The evidence shows that a certificate increasing the capital stock from $100,000 to $500,000 was executed on April 3, 1928. The tax was not paid to the state of New York until June 20, 1928, nor was the certificate filed in the secretary of state's office until that date. The certificate and receipt for payment of the tax were not filed in the New York county clerk's office until August 1, 1928. Until August 1, 1928, the increase of stock was not legally authorized. There is nothing in the minutes indicating any agreement that the item of $215,000 of debt should be wiped out by issuance of stock or that Sparler or Freedman or the Frigate Holding Corporation, Inc., would or did subscribe for or agree to take stock. Sparler may have had in mind doing that, but he did not do it. It is significant that, although the certificate authorizing the increase was signed April 3, 1928, it was not filed in the secretary of state's office until June 20th, and the receipt for the payment of the tax was not filed in the county clerk's office until August 1st, and that no certificates of stock were ever issued or even prepared. Had it been the real purpose of Sparler and the others interested in the corporation to put through the transaction as claimed, it would have been done at once. It does not appear to have been a bona fide transaction. Sparler appeared to be waiting to see which way the "dice would fall." Under certain contingencies he may have thought it better to have the books show that the corporation owed him the money; in the event of other contingencies, it might have been better to take the stock and wipe out the debt. In the event of bankruptcy which he was desperately attempting to head off, the first contingency would be preferable. If he could weather the storm, it might be better for future financial skylarking to show the corporation solvent. In any event, there is no evidence that the creditors, whether Sparler, Freedman, or the Frigate Holding Corporation, Inc., ever agreed orally or in writing to take the stock in liquidation of the debt. Had such an agreement been made, it would have been enforceable either by Sparler or by the bank-

rupt or by its creditors without any formal issue of stock (Buffalo & Jamestown R. Co. v. Gifford, 87 N.Y. 294, 295; Avon Springs Sanitarium Co. v. Kellogg, 125 App.Div. 51, 109 N.Y.S. 153, affirmed Smith v. Kellogg, 194 N.Y. 567, 88 N.E. 1132; Rutter v. Kilpatrick, 63 N.Y. 604; Mills v. Friedman, 111 Misc. 253, 181 N.Y.S. 285, affirmed Mills v. McNamee, 194 App.Div. 932, 184 N.Y.S. 613, affirmed 233 N.Y. 517, 135 N.E. 899; United States Radiator Corp. v. State of N. Y., 208 N.Y. 144, 149, 101 N.E. 783, 46 L.R.A. (N.S.) 585; Bedford v. American Aluminum Co., 51 App.Div. 537, 64 N.Y.S. 856), inasmuch as it would have been paid for in full.

The bankrupt constantly was going further in the red after April 3, 1928. It continued to operate at a loss. From June 30, 1927, to June 30, 1928, its operating losses aggregated $91,528.18; from June 30, 1928, to August 24, 1928, its losses amounted to $30,796.19. Sparler wrote up the inventory 100 per cent. on June 30, 1927 and again doubled it on June 30, 1928. It was selling its goods below cost, and Sparler knew it from at least June, 1927. He had no reasonable grounds for believing that his dreams of profits for the corporation through the manufacture of bottle tops would come true. From April 3d on, the bona fide indebtedness of the corporation was mounting tremendously by borrowings for the purchase of new machinery and the financing of its operations while its ability to pay was lessening. On its own showing, its books showed a deficit on June 30, 1928, of $116,000; its current assets were $134,228.29; its current liabilities $607,597.39. It finally wound up on August 24, 1928, with liabilities of $868,533.29 claimed by creditors in bankruptcy with assets of all kinds of $529,640.73 as shown by the books. The claims were shaved down in bankruptcy court to slightly under $400,000, but a dividend of only 5 per cent. has been paid.

■ Not only did the liabilities of the bankrupt exceed its assets at a fair valuation at the time of payment to defendant, but it was also, at all of such times, unable to meet its obligations as they accrued in the ordinary course of business. The corporation was thus insolvent within the meaning of the Bankruptcy Act (section 1 (15), 11 U.S.C.A. § 1 (15) and also within the meaning of section 15 of the Stock Corporation Law. Dalziel v. Rosenfeld, supra; Ferry v. Bank of Central N. Y., 15 How.Prac.(N.Y.) 445; Bielaski v. National City Bank (D.C.) 58 F.(2d) 657; Rosenberg v. Semple (C.C.A.) 257 F. 72. While defendant may successfully assert, under the evidence, that it did not actually know of the insolvency, nevertheless it was put on inquiry by the information it procured prior to May 11, 1928, and is chargeable with knowledge. Pender v. Chatham Phenix Nat. Bank & Trust Co. (C.C.A.) 58 F.(2d) 968; In re Clark (D.C.) 11 F.(2d) 540, 541; Fulghum v. Brown (D.C.) 291 F. 430. Defendant knew, or had reasonable cause to believe, that it was receiving a preference by the payments in question and the payments were made by the bankrupt with intent to prefer. Plaintiff has thus established its case, not only under section 15 of the Stock Corporation Law of the state of New York, but, as well, under the provisions of the Bankruptcy Act (section 60 [11 U.S.C.A. § 96]).

■ Only one more point raised by defendant needs attention. Defendant admits, by not denying in its answer or by admissions at the trial, that the Benedict Metal Works, Inc., owed the money to defendant and paid defendant what it owed on account of the three items above mentioned. That admission, in my opinion, is sufficient to establish that the moneys were paid out of the bankrupt's funds. However, defendant insists and attempted to prove that the moneys with which the payments were made belonged to Sparler personally, and thus the payments did not deplete the bankrupt's estate. The evidence will not support any such conclusion. Part of the money with which the discounts in question were paid come from the bankrupt's account at the Nassau National Bank in Brooklyn. It must be presumed that this money belonged to the bankrupt and was its property, in the absence of satisfactory evidence to the contrary. It is immaterial how those moneys got into the bankrupt's accounts in either bank because, in the case of defendant, they were all used for the corporation's benefit, and in the case of the Nassau Bank the bankrupt used for its own benefit at least that part of the moneys deposited in its account there and transferred to its account with defendant. In both banks the money was, for all practical purposes, loaned to the bank-

rupt for its own use and solely upon its own credit. In view of those facts it is not material that Sparler had these loans entered on the books of the bankrupt in his special and personal account. The bankrupt owed the money to somebody, and that person was the one who loaned the money to it. The case of Credit Alliance Corporation v. Sheridan Theatre Co., 241 N.Y. 216, 149 N.E. 837, cited by defendant, is not in point. There, the president of the corporation, without its authority, negotiated a loan in its name and gave its notes with forged collateral, and the proceeds were placed to the corporation account. The president at once drew the money out and used it for his own purposes. The corporation knew nothing of the loan and had no benefits from it. Whatever may be the facts as to Sparler's use of moneys for his own purposes supposed to have been loaned to the corporation on forged collateral in other cases, the testimony in the record of the case at bar shows that the loans were made by defendant to the bankrupt for its sole use and benefit, and were so used, and that the moneys with which the loans were paid were the property of the corporation.

Judgment may therefore be entered in favor of the plaintiffs and against the defendant for $27,432.30, with interest on $4,132.30 from May 11, 1928, on $11,650 from May 24, 1928, and on $11,650 from June 20, 1928, together with the taxable costs and disbursements of this action. If further findings of fact are required by plaintiffs, they may be submitted before entry of judgment. So ordered.