E. J. RAPHAEL, Trustee In Bankruptcy of J. P. Shepherd Lumber Company, Incorporated, Plaintiff,

v.

Harry M. ALCOTT et al., Defendants.

Civ. A. No. 283.

United States District Court
N. D. Mississippi,
Greenville Division.
Dec. 19, 1958.

R. T. Love, W. C. Keady, Greenville, Miss., for plaintiff, E. J. Raphael, Trustee in Bankruptcy of J. P. Shepherd Lumber Company, Inc.

Philip Mansour, Greenville, Miss., for defendants, Harry W. Alcott and Alcott Company, Inc.

Holland O. Felts, John C. Webb, Greenville, Miss., for defendants, J. P. and Mattyle Shepherd.

CLAYTON, District Judge.

Complaint was filed by the Trustee in Bankruptcy of J. P. Shepherd Lumber Company, Incorporated, bankrupt, as authorized by Section 70, sub. e, of the Bankruptcy Act, 11 U.S.C.A. § 110, sub. e, against Harry W. Alcott and The Alcott Company, Incorporated, and certain other parties whose interests are not now involved. By this action, the Trustee seeks to avoid the transfer of certain assets of the bankrupt corporation and subject such assets to payment of the creditors of the bankrupt.

Pertinent facts as they appear from admissions in the pleadings and other-

-wise and from the evidence presented on the trial are stated in the opinion.

(1) J. P. Shepherd Lumber Company was incorporated in January, 1955, with authorized capital stock of $20,000 consisting of 200 shares of common stock of a par value of $100 per share. The charter required 10 shares to be subscribed and paid for before the corporation was authorized to commence business. This corporation succeeded to the business previously operated under the same name by J. P. Shepherd and Harry W. Alcott as partners. The charter was amended in September, 1955, to increase the authorized capital stock to $70,000 consisting of 700 shares of common stock of a par value of $100 per share. That year J. P. Shepherd and his wife subscribed and paid for 280 shares and Harry W. Alcott and the members of his family subscribed and paid for 200 shares. Shepherd was President of the corporation and directed its business operations. Alcott was Secretary from the organization of the corporation until at least August 15, 1956, and at all times was spokesman and agent for the other stockholders in his family.

(2) The principal business of this corporation was contracting for the construction of residences and other buildings, but it also sold building materials at retail. In connection with its construction contracts, it executed various performance bonds on which The Fidelity and Casualty Company of New York became surety and some upon which United States Fidelity and Guaranty Company was surety. Financial statements were submitted to these surety companies purporting to show the assets and liabilities of the corporation at different periods. These performance bonds were executed by both surety companies for the corporation at various times on the condition that Shepherd, his wife, and sometimes Alcott execute indemnity agreements to the corporate sureties. Most, if not all, of these financial statements and one issued to The First National Bank of Greenville on June 30, 1955, claimed as corporate assets 3 lots in Woodlawn Addition and 2 lots in Mattingly-Frazier Addition at a total cost to the corporation of $10,892.-93.

(3) In September, 1955, the corporation acquired for $28,000 cash a 55 acre tract of land intended for residential development, which was called "Cherokee Gardens". This purchase gave rise to the increase in authorized stock and the increase of invested capital to $48,000. After this purchase, the corporation sold buildings located on this land for a net of $1,278.95, thus leaving the cost of this property at $26,721.05, which was the figure carried on the corporate records as the cost of this property and entered on its tax return for the year 1955.

(4) In computing its operating loss for the fiscal year 1955, ending January 31, 1956, the corporation accounted for real estate owned costing $37,613.98 ($10,892.93 plus $26,721.05) obviously being the lots in Woodlawn Addition, the lots in Mattingly-Frazier Addition and Cherokee Gardens. Its operating statement for that fiscal year showed a deficit of $316.26 charged against paid in capital which was shown at $48,000.

(5) On September 27, 1955, Harry W. Alcott paid $4,000 to J. P. Shepherd Lumber Company, showing thereon that it was in payment for 3 acres of the Cherokee Garden tract on which the Pehl house was located. Both Alcott and Shepherd testified that Alcott was to have this tract as his individual property. However, this claim cannot be reconciled with the aforementioned corporate records with respect to the net cost of the Cherokee Gardens property nor with the various financial statements issued by the corporation. On most, if not all, of these records and statements, the cost of the Cherokee Gardens property was shown as aforementioned. Record title to all of the Cherokee Gardens property remained in the corporation until August 15, 1956, and no deed was executed to Harry W. Alcott, individually, for any part of this property. The

weight of the evidence indicates that, after the purchase of this property, it was decided that Alcott would apply this payment toward the purchase of stock.

(6) The corporation's basic books consisted of a cash journal and a general ledger. No accounts payable ledger was kept, but trade and other invoices were loosely kept in a file folder. There was an accounts receivable ledger in which charges to customers were posted irregularly. From time to time, the accounts receivable would be adjusted by the corporation's bookkeeper to reflect estimates of work completed on the various construction jobs. A physical inventory was taken only at the end of the fiscal year which closed with January 31.

(7) During the life of the now bankrupt corporation, Alcott was President and a stockholder of Mill Supplies, Incorporated, another corporation, which sold industrial supplies to customers. He is an intelligent businessman, conversant with inventories, accounts receivable and trade accounts payable. He knows how to read a balance sheet and determine the net worth of a company. Shepherd was a builder, and, apparently, had small business experience other than his efforts to direct the bankrupt's business, which were characterized by poor estimates, poor bidding on contracts, excessive costs in construction and consistent loss of money in the bankrupt's operations.

(8) It is apparent that there was a very substantial operating loss to the corporation from February 1, 1956, to June 30, 1956. The size of that loss would depend, in large measure, upon the value of the merchandise inventory at the latter date. This actual merchandise inventory is not known. The only records available in that regard consist of two slips of paper, located in the working papers of an accountant, upon which figures purporting to be merchandise inventory at June 30, 1956, were written. It is not shown who prepared these two slips of paper, and, hence, it cannot be known whether either of them have any validity or not. Considering the lower figure of slightly more than $8,000 (the figure more in line with the financial history of the bankrupt corporation's operations) the operating loss for the five month period would have been $20,132.95, averaging more than $4,000 per month for that period. Other plain facts also appear. By May, 1956, the corporation's bank loans had increased by $8,000 over the amount owing at January 31, 1956. All bank loans were personally endorsed by Shepherd, and $5,000 thereof was also endorsed by Alcott. By May 16, 1956, Mrs. Shepherd had advanced $7,000 on open loans to the corporation. By June 30, 1956, payments had been made to the corporation by Alcott totaling $10,000 as a part of the transaction afterward mentioned, but in spite of this additional $25,000 made available to the corporation by these loans and by these payments, the corporation was unable to maintain a bank balance. Its overdraft as of June 30, 1956, was $1,369.27. Before that, the month end bank balance had either small credits or overdrafts. Shepherd, actively in charge of the business of the corporation, and Alcott, representing substantial stockholder interests and an officer of the corporation, both knew of this situation or are charged with the knowledge thereof. It may be significant to note that the first payment made by Alcott of $5,000 on May 16 was applied by the corporation in payment of its note in that same amount which was endorsed by Alcott personally.

(9) According to their testimony, Alcott and Shepherd had an informal understanding in about May of 1956, which contemplated that, for certain considerations, the investment real estate of the corporation, carried at a cost of $37,613.98 would be conveyed to The Alcott Company, Incorporated, a corporation organized by Alcott for himself and family for the express purpose of receiving title to this real estate. Alcott was the President and dominant figure in that new enterprise. In their informal discussions, it was assumed that Alcott would

surrender to the corporation 200 shares of stock owned by him and the members of his family. Although, as against creditors, outstanding stock is in no sense a real liability of a corporation, it is significant to note that no effort was made to determine the book value, if any, which the 200 shares of Alcott stock in the bankrupt corporation then had. Neither Alcott nor Shepherd requested the corporation bookkeeper to prepare a financial statement showing the then current financial condition of the corporation. No physical inventory was taken by Shepherd or the corporate officers. No effort was made to determine the amount of accounts payable then owing by the corporation. No resolution was adopted by the stockholders and officers of the corporation ratifying or recognizing the informal understanding between Alcott and Shepherd until June 1, 1957. Instead, Alcott paid to the corporation certain sums which were credited on the corporate records to the cost of the Cherokee Gardens property. These sums and the dates upon which payments were made are as follows: $5,000 on May 16, 1956; $3,000 on June 12, 1956; $2,000 on June 29, 1956; $848.26 on August 16, 1956, for a total of $10,848.26. On August 15, 1956, the bankrupt deeded to The Alcott Company, Incorporated, the Cherokee Gardens property reciting that the consideration was the transfer of 200 shares of stock by the Alcotts to the wife of J. P. Shepherd. A companion deed was executed by Alcott and Shepherd on the same date conveying to The Alcott Company, Incorporated, two lots in Mattingly-Frazier Addition and the two remaining lots in Woodlawn Addition (one had been sold on June 30, 1956, by the corporation for $1,905), which property admittedly the grantors were holding as trustees for the corporation. The 200 shares of stock held by the Alcotts were turned in to the corporation for retirement and cancellation. Nothing was paid to the corporation by Mrs. Shepherd for the conveyance of this real estate to the Alcott Company, Incorporated. Nothing more was paid to the cor-

poration for these transfers at the time of the execution and delivery of the deeds. As of November 1, 1956, there appeared on the corporate records the entry of a note given to the corporation by The Alcott Company, Incorporated, maturing five years after November 1, 1956. The date of execution of this note was shown on the face thereof as November 1, 1956. This note left the corporate records as of February 1, 1957, by a transfer thereof to Mrs. Shepherd. This note has not yet been paid. The real estate transaction was entered on the corporate books by its bookkeeper in late September, 1956, at which time entries were made showing that 200 shares of stock had been retired by the corporation. No receivable was ever entered on the corporate records showing that Mrs. Shepherd was indebted to the corporation for any amount on account of the transfer of real estate to The Alcott Company, Incorporated, and Mrs. Shepherd never agreed to pay anything to the corporation for the assets received by The Alcott Company. Upon its retirement the Alcott stock was dealt with at par, namely $20,000.

(10) The corporation's bookkeeper, although not requested so to do by Alcott or Shepherd, began efforts to determine the condition of the corporation as of June 30, 1956, but this work was not completed until after fruition of the aforementioned transaction.

(11) The deeds conveying the corporation's real estate to The Alcott Company, Incorporated, were filed for record on August 15, 1956. Nothing on the face of these conveyances gave notice that any of the corporation's capital stock had been retired or that its financial condition had been adversely affected in any way. Thus, the impairment of the capital structure of the corporation was a secret thing.

(12) In addition to the payments made directly to the corporation and the retirement of the Alcott stock, Alcott and The Alcott Company, Incorporated, as a part of the real estate transactions in

question, paid $2,498.06 indebtedness owed by the bankrupt corporation. These payments and the dates upon which they were made are as follows:

| Date: | To Whom Paid | Amount |
|---|---|---|
| 7/18/56 | Greenville Contracting Company | $385.14 |
| 7/20/56 | Greenville Gravel Company | 373.64 |
| 8/ 7/56 | Commercial National Bank | 327.42 |
| 12/ 3/56 | Greenville Gravel Company | 300.00 |
| 12/ 4/56 | Commercial National Bank | 416.77 |
| 12/ 9/56 | Greenville Contracting Company | 535.60 |
| 1/29/57 | City of Greenville | 12.74 |
| 1/30/57 | M. H. James, Sheriff | 146.75 |

If these payments made by Alcott and The Alcott Company, Incorporated, of obligations of the bankrupt corporation are to be considered in the same light as payments made directly to the corporation on account of this transaction, then, at best, there was paid $13,346.32 for real estate of the bankrupt corporation, having a cost to it of $35,708.98 ($37,-613.98, total book cost of all investment real estate, less net sale price of $1,905 shown for the sale of one Woodlawn Addition lot by the corporation). With respect to its creditors, this would represent a real loss on this transaction to the corporation of no less than $24,267.-66, excluding from consideration the $5,000 note, aforementioned, or a real loss of $19,267.66 if the note is credited at face value.

(13) After the deeds of August 15, 1956, the corporation became more hopelessly involved as it undertook to continue its operations. At no time thereafter was it able to operate at a profit and its losses continued to mount. It could not have continued in business except that Mrs. Shepherd continued to advance money to the corporation without regard to the lack of wisdom in so doing. Bank loans were endorsed by Shepherd personally, and all performance bonds, on which United States Fidelity and Guaranty Company became surety, were on personal indemnity signed by Shepherd and his wife. At no time after the August 15, 1956, transaction was the corporation able to pay its debts from its own resources or in the ordinary course of business.

(14) Consistently and habitually, during its sickly existence, this corporation conveyed a false impression as to its net worth by its financial statements. Its statement showing its condition as of January 31, 1956, submitted to The First National Bank, falsely represented that it then had a total capital and earned surplus of $52,683.74. Its true net worth at that date, based on conventional accounting methods, could not have been more than $47,683.74. No supplemental or corrected statement was submitted to the bank. Several thousand dollars were owed to the bank when the corporation was adjudicated a bankrupt, but this claim was not proved in bankruptcy, since the bank elected to look to Shepherd on his personal endorsement. On March 1, 1956, the corporation submitted a financial statement to United States Fidelity and Guaranty Company purporting to show its financial condition as of January 31, 1956. This statement incorrectly showed a capital and surplus of $73,833.38. As a part of this application, the corporation undertook to promptly notify the company if there should thereafter occur any material change in its financial condition. No supplemental or revised statement was submitted until the year following, as of January 31, 1957, at which time this bonding company ceased to write performance bonds. On March 27, 1956, United States Fidelity and Guaranty

Company became surety on a performance bond in favor of First Christian Church for $53,868. The surety was required to pay items, on account of this undertaking, amounting to $2,100. Claim therefor has been filed in bankruptcy. On August 17, 1956, two days after the real estate transfer, United States Fidelity and Guaranty Company became surety on the performance bond required in the construction of the W. G. Kimbrell residence in the amount of $18,418. The surety had to pay the sum of $1,689.10 on account of this bond, for which it has filed its claim in bankruptcy. When the Kimbrell bond was delivered, the local agents for United States Fidelity and Guaranty Company learned, for the first time, that Alcott was no longer a stockholder in the corporation, but they were not furnished a revised or corrected financial statement. These agents did not know and were not told, that the capital of the corporation had been impaired by the real estate transfer of August 15, 1956. In the latter part of September, 1956, United States Fidelity and Guaranty Company became surety on a performance bond in favor of Washington County Board of Education for $15,895.26. Shepherd and his wife were personal indemnitors on this bond, but the surety company also relied upon the corporation's financial statement as of January 31, 1956. It was not told and did not know that about forty percent of the capital stock had been retired at par value or that the real estate had been transferred. Three thousand, six hundred seven dollars and seventy-four cents was paid by the surety to complete this job, for which claim has been filed in bankruptcy. As late as January 15, 1957, the corporation misrepresented its financial condition to United States Fidelity and Guaranty Company in order to post a performance bond for the construction of Blue Flame Lodge. This bond was in favor of Mississippi Valley Gas Company, and the surety was required to pay $1,594.07 on account thereof, for which claim has been filed in bankruptcy. The total owed this surety company, on account of these bonds, is $5,743.91. Other unsecured debts are owed by the bankrupt having origin before August 15, 1956.

(15) On July 5, 1956, about two months after the transaction in question was conceived, the corporation submitted to Dun and Bradstreet, national credit rating institution, a statement which erroneously showed it had a net worth of $47,683.74 as of January 31, 1956. This statement was received in the Memphis, Tennessee, offices of Dun and Bradstreet on July 11, 1956, and was distributed the following day to approximately 4000 subscribers in the Mid-South area. As was customary, this statement was for general circulation until Dun and Bradstreet was furnished a revised statement as of a subsequent date. No additional statement was submitted. Hence, the false impression conveyed by this statement, absent any revision, continued to be circulated for a period of many months thereafter. This was an express concealment of the radically changed financial condition of the corporation. The probability is great that this false information was circulated to many of the unsecured creditors of the now bankrupt corporation whose claims have been filed in bankruptcy.

(16) Neither Alcott nor The Alcott Company, Incorporated, made any effort to pay the liabilities owing by the corporation at the time of fruition of this real estate transaction and no provision for payment of those liabilities was made. Creditors were not notified in any way. In fact, it is clear that no consideration was given to creditors by any of the parties to this transaction, although it is equally clear that these parties in interest knew that the corporation would continue in business.

(17) The J. P. Shepherd Lumber Company, Incorporated, was adjudicated a bankrupt on or about December 9, 1957. Liquidation of the bankrupt's assets thus far have resulted in recoveries totaling $10,443.82, and it is possible that $500 more may be collected from assets avail-

**698**

able to the Trustee. Unsecured creditors, for whose benefit this action is brought, have filed claims totaling $47,-673.95.

(18) The first question for solution is that of the solvency "yard-stick" to be applied by this court with which to measure the condition of J. P. Shepherd Lumber Company, Incorporated, and the effect the real estate transaction under consideration had thereon. We are concerned with what is called "commercial insolvency" or inability to pay debts as they come due in the ordinary course of business, Kullman & Co. v. Woolley, 5 Cir., 83 F.2d 129; Bielaske v. National City Bank of New York, D.C., 58 F.2d 657. This definition is followed in most states. Section 13, Glenn, The Law Governing Liquidation.

■ (19) This corporation was never solvent in a real sense of the word from its organization to the date of its bankruptcy. It was never able to pay its debts in the ordinary course of business from its own resources or by a legitimate use of its own corporate credit. The personal credit of Shepherd, his wife, and Alcott was necessary at all times to keep the head of this sickly infant above water. So weak, in fact, was this corporation, that it was considered advisable to enhance to its creditors, and possible creditors, an appearance of strength and vigor by the dissemination of false information in the form of financial statements. Even by conservative and conventional accounting methods, ordinarily used for business purposes, the corporation was obviously insolvent after the transaction of August 15, 1956, at which time conventional liabilities exceeded conventional assets by more than $6,000. This transaction was definitely the death blow and the continuance in business of this corporation thereafter was a legal fraud, if not an actual fraud, on all of its subsequent creditors.

■ (20) The transfer of all the investment real estate of the bankrupt to the nominee corporate creature of an officer of the bankrupt, who was an agent for more than 40 percent of the outstanding stock of the bankrupt, for a grossly inadequate consideration shocks the conscience and was void as against existing creditors of the corporation. Sections 5811 and 5328, Mississippi Code 1942; Kimbrough v. Davies, 104 Miss. 722, 61 So. 697; First Nat. Bank of Laurel v. Pearson, 109 Miss. 638, 68 So. 921; Frazier v. Zachariah, 174 Miss. 378, 164 So. 893.

■ (21) With respect to the rights of creditors, whose claims against the bankrupt originated after August 15, 1956, the actual intent of Alcott and Shepherd is immaterial. Even if they had acted with good motives and honest intent, under the circumstances stated the law implies actual intent to defraud. The law will not permit a stockholder-officer to deplete the assets of a corporation to his own advantage and become a party to the continuance of the corporation in business with the appearance of solvency, where the natural and foreseeable probable effect is to prejudice persons afterward dealing with the corporation as solvent. Coleman v. Tepel, 3 Cir., 230 F. 63. In a case of striking similarity, it was said,

"It is unnecessary to hold that the members of appellant's firm acted in bad faith, or with any fraudulent design in selling their stock. Nor is it shown that they used any improper persuasion to that end. So far as appears they were no more willing to sell than the other parties were to buy, and the latter very likely thought they were making a good bargain. No inventory was taken, and no reliable measures adopted for getting at the true value of the merchandise then on hand, whether for continuing or closing out the business, or the amount that could be collected from the unpaid book accounts. The only reasonable inference from the record is that neither party realized the actual state of affairs, and that both of them largely overestimated what the belongings of the company were worth for any purpose. In short,

there may have been an honest belief on both sides that there was a margin of assets over liabilities, and an honest expectation that the concern would be able to pay its debts and make a success of the business." M. V. Moore & Co. v. Gilmore, 4 Cir., 216 F. 99, at page 100.

Many other cases support this view. Some of them relied upon are: International Telephone & Telegraph Corporation v. Holton, 4 Cir., 247 F.2d 178; Jarroll Coal Company v. Lewis, 4 Cir., 210 F.2d 578; Robinson v. Wangemann, 5 Cir., 75 F.2d 756; McCaffrey v. Elliott, 5 Cir., 47 F.2d 72; Hoyt v. Haampe, 206 Iowa 206, 214 N.W. 718, 220 N.W. 45; Bingaman v. Commonwealth Trust Company, D.C., 15 F.2d 119; First Trust Company v. Illinois Central Railroad Company, 8 Cir., 256 F. 830; Mackall v. Pocock, 136 Minn. 8, 161 N.W. 228; Atlanta & Walworth Butter & Cheese Ass'n v. Smith, 141 Wis. 377, 123 N.W. 106; Hilliard v. Cagle, 46 Miss. 309. The transfer of this real estate, under the facts in this case, was also void as to creditors whose claims originated after August 15, 1956.

(22) But, the facts are not sufficiently strong to support a finding of actual fraud. Hence, the correct rule to be applied is that credit will be given to the extent of the value of the consideration actually paid to the bankrupt and for the bankrupt. Holman v. Hudson, 188 Miss. 87, 193 So. 628; Blount v. Blount, Miss., 95 So.2d 545; Frank v. Von Bayer, 236 N.Y. 473, 141 N.E. 920. To express it differently, the transfer of this real estate is void as to existing and subsequent creditors to the extent of the inadequacy of the consideration paid by Alcott and The Alcott Company. The difference between cost of the investment real estate to the corporation and the value paid by Alcott and The Alcott Company, plus the note issued by The Alcott Company is $19,267.66. This is the amount which inures to the benefit of the unsecured creditors of the bankrupt. The conveyances are sustained to the extent of the consideration therefor and

The Alcott Company will have a lien on the subject property to secure payment to them of $18,346.32. Holman v. Hudson, supra.

The order will be prepared in accordance with this opinion.